### In re: STOCK EXCHANGES OPTIONS TRADING ANTITRUST LITIGATION

Lynn S. Miller, Individually and on behalf of all others similarly situated, Mark Steinberg, individually and on behalf of all others similarly situated, Ram Yariv, individually and on behalf of all others similarly situated, Alan Haenel, individually and on behalf of all others similarly situated, Yakov Prager, individually and on behalf of all others similarly situated, Thomas P. Lynch, individually and on behalf of all others similarly situated, Mary Chiu, individually and on behalf of all others similarly situated, Harry Binder, individually and on behalf of all others similarly situated, Estate of Wanda Graham, on behalf of itself and all others similarly situated, William Thedford, individually and on behalf of all others similarly situated, Consolidated–Plaintiffs–Appellants,

Robert Strougo, Esq., individually and on behalf of all others similarly situated, LSP Partners L.P., Alan Boryk, Edward Meisel, Bruce McCall, Jeffrey Broderick, Adam Edelstein, Barry Pinkowitz, Rachel Chuang, Alan Nussbaum, George Kinney, Ronald K. Drucker, Robert Dunn, Wilson N. Krahnke, Marc Seidband, John P. Abbamondi, Richard T. Devincent, I. Scott Edelstein, Lonnie B. Reiver, Ronnie A. Yarborough, Jason Silver, Elliot Braun, Plaintiffs–Appellants,

v.

American Stock Exchange, Inc., a New York not for profit Corp., Chicago Board Options Exchange, Inc., a Delaware not for profit Corp., Philadelphia Stock Exchange, Inc., A Delaware not for profit Corp., Pacific Exchange, Inc., a California Corporation., New York Stock Exchange, Inc., a New York not-for-profit corp., Wolverine Trading, L.P., Susquehanna Investment Group Inc., John Does 1–100, Spear, Leeds & Kellogg, L.P., a New York Limited Partnership., AMEX, CBOE, PHX, PCX, M.J.T. Securities LLC, Cole, Roesler Trading, L.P., Assets Mondial, LLC., Kodiak Capital Management, LLC., Chin Options LLC., Oppenheimer, Noonan, Weiss, L.P., Arbitrade LLC., Timber Hill L.L.C., Professional Edge Fund, L.P. Tague Securities Corp., Lakota Trading Inc., Refco Securities, Inc., Bridgeport Securities Group Co., Johnson Trading Corp., Group One Trading L.P., Beartooth Trading Inc., Cranmer & Cranmer, Inc., Goin & Co., L.L.C., Ags Specialist Partners, LETCO, Bearhunter LLC., Kalb, Voorhis & Co., LLC., Highland Securities Co., GHM, Inc., D.A. Davidson & Co., Inc., Charlton, Inc., Hull Trading Co. L.L.C., Binary Traders, Inc., Defendants–Appellees.

Docket Nos. 01–7371, 01–7580.

United States Court of Appeals,
Second Circuit.

Argued: Feb. 26, 2002.

Decided: Jan. 9, 2003.

Arthur R. Miller, Cambridge, Massachusetts (Bruce E. Gerstein, Stephen H. Schwartz, Jeffrey M. Lax, Garwin Bronzaft Gerstein & Fisher, New York, New York, Andrew D. Friedman, Wechsler Harwood Halebian & Feffer, New York, New York, Bernard Persky, Barbara Hart, Goodkind Labaton Rudoff & Sucharow, New York, New York, Joseph C. Kohn, Steven M. Steingard, Kohn, Swift & Graf, Philadelphia, Pennsylvania, on the brief), for Consolidated–Plaintiffs–Appellants and Plaintiffs–Appellants.

Jay N. Fastow, New York, New York (Irving Scher, Adam P. Strochak, Weil, Gotshal & Manges, on the brief), for Defendant–Appellee New York Stock Exchange, Inc.

Skadden, Arps, Slate, Meagher & Flom, New York, New York (William P. Frank, Peter E. Greene, Shepard Goldfein, New York, New York, of counsel), Howrey Simon Arnold & White, Washington, D.C. (John W. Nields, Jr., Washington, D.C., of counsel), Willkie, Farr & Gallagher, New York, New York (William H. Rooney, Ian K. Hochman, New York, New York, of counsel), and Wilmer, Cutler & Pickering, Washington, D.C. (Bruce E. Coolidge, Washington, D.C., of counsel), filed a joint brief for, respectively, Defendants–Appellees American Stock Exchange, Inc., Chicago Board Options Exchange, Inc., Philadelphia Stock Exchange, Inc., and Pacific Exchange, Inc.

H. Peter Haveles, Jr., New York, New York (Douglas I. Koff, Adam Masin, Cadwalader, Wickersham & Taft, New York, New York, on the brief), for Defendant–Appellee Timber Hill L.L.C.

Dilworth Paxson, Philadelphia, Pennsylvania (James J. Rodgers, Philadelphia, Pennsylvania, of counsel), for Defendant–Appellee Tague Securities Corp., joined the brief of Defendant–Appellee Timber Hill L.L.C.

David Bohan, Chicago, Illinois (Michael D. Richman, Sachnoff & Weaver, Chicago, Illinois, Scott M. Hines, Michael J. Grudberg, Stillman & Friedman, New York, New York, on the brief) for Defendant–Appellee LETCO.

Piper Marbury Rudnick & Wolfe, New York, New York (Douglas A. Rappaport, New York, New York, Leonard L. Gordon, Washington, D.C., Christopher J. Barber, Nancy L. Hendrickson, Chicago, Illinois, of counsel) filed a brief for Defendant–Appellee D.A. Davidson & Co., Inc.

Fineman & Bach, Philadelphia, Pennsylvania (Steven R. Waxman, Philadelphia, Pennsylvania, of counsel), for Defendant–Appellee Binary Traders, Inc., joined the brief of Defendant–Appellee Timber Hill L.L.C.

Charles A. James, Assistant Attorney General, Washington, D.C. (John M. Nannes, Deputy Assistant Attorney General, Catherine G. O'Sullivan, David Seidman, Attorneys, United States Department of Justice, Washington, D.C., of counsel), filed a brief for Amicus Curiae United States in support of Appellants.

Daniel J. Popeo, Washington, D.C. (Richard A. Samp, Washington, D.C., of counsel), filed a brief for Amicus Curiae Washington Legal Foundation in support of Defendants–Appellees.

Before: KEARSE and JACOBS, Circuit Judges, and JONES, District Judge *.

KEARSE, Circuit Judge.

Plaintiffs in these class action suits, which were consolidated for pretrial purposes in the United States District Court for the Southern District of New York, appeal from a judgment of that court, Richard Conway Casey, *Judge,* dismissing their claims that the conduct of defendants American Stock Exchange, Inc. ("AMEX"), *et al.,* in restricting stock-exchange listings of certain securities for options trading violated § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (2000) ("Sherman Act"). The district court granted summary judgment in favor of defendants, ruling that the Sherman Act, insofar as it might have applicability to the listing and trading of options on securities exchanges regulated by the Securities and Exchange Commission ("SEC" or "Commission"), has been impliedly repealed by the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (2000) ("Exchange Act"). Plaintiffs also appeal from a postjudgment order of the district court, ruling that the implied repeal of the Sherman Act with respect to plaintiffs' claims deprived the court of subject matter jurisdiction to entertain motions, made under Fed. R.Civ.P. 23(e) prior to the court's ruling on the motions for summary judgment, for judicial approval of settlement agreements entered into between plaintiffs and certain of the defendants. On appeal, plaintiffs contend principally that the district court

erred (a) in holding that the Sherman Act's application to restrictions on options listing and trading is impliedly repealed by the Exchange Act, and (b) in ruling that the court lacked jurisdiction to approve the proposed settlements of these class actions. For the reasons that follow, we affirm the dismissal of the antitrust claims, but we vacate the postjudgment order and remand for further proceedings with respect to the settlement agreements.

## I. BACKGROUND

The present litigation involves the trading of equity options on various stock exchanges. The facts material to the district court rulings that are the subject of this appeal are not in dispute.

### A. *The Complaints, the Motions To Dismiss, and the History of SEC Regulation of Options Trading*

Plaintiffs are persons who purchased equity options after December 31, 1994. Defendants are AMEX, the Chicago Board Options Exchange, Inc. ("CBOE"), the New York Stock Exchange, Inc. ("NYSE"), the Pacific Stock Exchange, Inc. ("Pacific Exchange"), the Philadelphia Stock Exchange, Inc. ("Philadelphia Exchange") (collectively "the Exchanges"), and members of the Exchanges that acted as market makers and specialists in options trading (the "market maker defendants"). In early 1999, various plaintiffs commenced more than 20 class actions alleging that defendants had conspired to restrict the listing and trading of particular options to one stock exchange at a time, thereby restraining trade in such options in violation of § 1 of the Sherman Act.

---

* Honorable Barbara S. Jones, of the United States District Court for the Southern District of New York, sitting by designation.

The Judicial Panel on Multidistrict Litigation transferred the actions to the Southern District of New York for consolidated pretrial proceedings. A consolidated complaint was filed, alleging antitrust violations as described above and seeking monetary and injunctive relief. In January 2000, the Exchanges, joined by the market maker defendants, moved pursuant to Fed.R.Civ.P. 12(b)(6) for dismissal of the consolidated complaint on the ground, *inter alia*, that Congress had impliedly repealed the antitrust laws with respect to the listing and trading of options by empowering the SEC to regulate those matters.

The history of the SEC's regulation of options trading on securities exchanges is undisputed and is set forth in detail in the Opinion and Order of the district court dated February 14, 2001, which dismissed the antitrust claims, *see In re Stock Exchanges Options Trading Antitrust Litigation*, 99 Civ. 962, 2001 WL 128325 (S.D.N.Y. Feb.15, 2001) ("District Court Opinion" or "February 14 Opinion"). The course of that regulation is summarized here.

The trading of options on national exchanges began in 1973 when CBOE became registered as a national exchange; such trading was regulated in Rule 9b–1, promulgated by the Commission under the Exchange Act, *see* SEC Rule 9b–1, 17 C.F.R. § 240.9b–1. When other exchanges proposed to list options for trading, the SEC commenced a study of the practice, including the question of whether the trading of options on a given class of securities should be allowed to proceed on multiple exchanges. *See* SEC Release No. 10490, 1973 SEC LEXIS 2349, at *1, *9–*10 (Nov. 14, 1973). After a public hearing, the Commission concluded in 1974 that additional study was required before allowing, *inter alia*, "multiple exchange option trading." SEC Release No. 11144, 1974 SEC LEXIS 2108, at *4 (Dec. 19, 1974). At that time, the SEC authorized AMEX to allow options trading, and it noted that AMEX did not intend to allow dual trading. *See id.* at *5.

In 1976, the SEC allowed CBOE to list options that were already traded on another exchange. *See generally* SEC Release No. 26809, 1989 SEC LEXIS 828, at *5 (May 11, 1989). It also allowed the Pacific Exchange to commence options trading and noted that that Exchange planned to list options that were being traded on other exchanges. *See* SEC Release No. 12283, 1976 SEC LEXIS 2040, at *3 (Mar. 30, 1976). In early 1977, the Commission invited public comment on multiple listing, *see* SEC Release No. 13325, 1977 SEC LEXIS 2290, at *1 (Mar. 3, 1977), and expressed concern that, in the course of trading options listed on more than one exchange, floor members of certain exchanges might be violating the Exchange Act, *see* SEC Release No. 13433, 1977 SEC LEXIS 2036, at *1 (Apr. 5, 1977). Later in 1977, the Commission requested that the exchanges voluntarily cease the listing of new options classes pending a comprehensive SEC review of options trading. *See* SEC Release No. 13760, 1977 SEC LEXIS 1251, at *1 (July 18, 1977). It proposed to issue a rule temporarily barring such new listings if the exchanges would not suspend them voluntarily; the rule became unnecessary because the exchanges complied voluntarily, *see* SEC Release No. 15026, 1978 SEC LEXIS 997, at *3 (Aug. 3, 1978), and continued to comply until the SEC lifted the moratorium in 1980, *see* SEC Release No. 16701, 1980 SEC LEXIS 1784, at *1 (Mar. 26, 1980) ("SEC Mar. 26, 1980 Release").

In 1980, the Commission permitted the resumption of new listings and trading

generally, but it stated that it needed to consider further

> whether to continue its current policy of restricting multiple trading in exchange-traded options or whether to permit a more unfettered competitive environment in which an options exchange would be free to trade any eligible options class, subject to the adequacy of its surveillance and other self-regulatory capabilities.

*Id.* at \*22–\*23. As the district court noted,

> [t]he SEC identified a number of possible adverse effects from multiple trading, including (i) market fragmentation; (ii) the likelihood that meaningful competition among market centers may be, at best, transitory because of member firms' automatic order routing practices; and (iii) the potential negative impact on the financial position of the regional exchanges. [SEC Mar. 26, 1980 Release] at \*28–\*30. The Commission believed that some of its concerns might be alleviated by the development of market integration facilities, and expressed an inclination toward multiple trading. However, the SEC deferred further action, requesting that the exchanges consider "whether, and to what extent, the development of market integration facilities would minimize concerns regarding market fragmentation and maximize competitive opportunities in the options markets." *Id.* at \*32.

District Court Opinion, 2001 WL 128325, at \*4.

On May 30, 1980, the SEC approved a plan, formulated by the exchanges jointly, for the single, or exclusive, listing of any new equity option. *See* SEC Release No. 16863, 1980 SEC LEXIS 1378, at \*1–\*2 (May 30, 1980). The new listings were to be allocated among the several exchanges on a rotating basis. *See id.* While permitting multiple listings of other types of options and of over-the-counter securities, the Commission remained concerned that "unlimited multiple trading of equity options at this time might result in significant deleterious str[uc]tural changes in the markets, with a resultant decrease in competition in other areas such as services relating to execution and clearing functions." SEC Release No. 17577, 1981 SEC LEXIS 1976, at \*17 (Feb. 26, 1981) (footnote omitted).

In 1987, the Commission proposed the adoption of a multiple-trading rule and announced the commencement of a proceeding to consider, *inter alia*, whether to permit such multiple-market trading. *See* SEC Release No. 34–24613, 1987 SEC LEXIS 4394, at \*5 (June 18, 1987). In 1989, the Commission announced the adoption of Rule 19c–5, which it described as allowing "an exchange unilaterally [to] decide, as a business matter, not to multiply trade any particular option," but prohibiting an exchange from "reach[ing] an agreement with one or more other exchanges to refrain from multiple trading." SEC Release No. 34–26870, 1989 SEC LEXIS 941, at \*39 (May 26, 1989). Multiple listing was to be implemented gradually. Rule 19c–5 provided that, as of January 22, 1990, an exchange was to be prohibited from adopting any rule, policy, or practice that limited its ability to list any equity options that had first been listed on an exchange on or after that date, *see* SEC Rule 19c–5(a)(1), 17 C.F.R. § 240.19c–5(a)(1) (2002); from January 22, 1990, to January 21, 1991, an exchange was to be prohibited from adopting such a rule, policy, or practice with respect to 10 classes of options that had been listed on another exchange prior to January 22, 1990, *see* SEC Rule 19c–5(a)(2), 17 C.F.R. § 240.19c–5(a)(2) (2002); and effective January 21, 1991, an ex-

change was to be prohibited from adopting such a rule, policy, or practice with respect to any equity options, *see* SEC Rule 19c–5(a)(3), 17 C.F.R. § 240.19c–5(a)(3) (2002) ("[N]o rule, stated policy, practice, or interpretation of this exchange shall prohibit or condition, or be construed to prohibit or condition or otherwise limit, directly or indirectly, the ability of this exchange to list any stock options class because that options class is listed on another options exchange.").

Notwithstanding the terms of Rule 19c–5, the SEC, shortly before the Rule was to become effective, asked exchanges to refrain from the multiple listing of such options as had previously been listed only singly. (*See, e.g.,* Letter from SEC Chairman Richard C. Breeden to AMEX Chairman James R. Jones, dated January 9, 1990, at 3.) Such requests were renewed over the next 2½ years. (*See, e.g.,* Letter from SEC Chairman Richard C. Breeden to CBOE Chairman Alger B. Chapman, dated July 31, 1991, at 2 ("As you know, I have repeatedly asked the options exchanges not to commence. multiple listing under Rule 19c–5" pending the development of a cost-effective linkage mechanism); Letter from SEC Chairman Richard C. Breeden to AMEX Chairman James R. Jones, dated June 30, 1992, at 4 ("[A]lthough Rule 19c–5 remains in effect, I would ask you to extend the application of the voluntary moratorium until November 20, 1992, to provide the exchanges adequate time to make any rule changes or operational enhancements necessary to implement [a proposed] Phase–In Plan.").)

The SEC's moratorium on multiple listing was lifted beginning in November 1992. By the end of 1994, all equity options were eligible for multiple listing. The Commission had noted, however, that it retained ultimate authority over such listings:

Section 19(h) [of the Exchange Act] provides the Commission with the authority to take action against an exchange if the Commission finds that the exchange is in violation of the [Exchange] Act, the rules and regulations thereunder, or its own rules. Accordingly, notwithstanding the [phase-in] Plan, the Commission has the authority to prevent an exchange from listing a new option if the Commission finds that the option does not meet the exchange's initial options listing standards.

SEC Release No. 34–29698, 1991 SEC LEXIS 1864, at *12 (Sept. 17, 1991). In 1997, the SEC exercised this authority to approve the sale by NYSE of its options business to CBOE. The SEC rejected assertions that the sale tended to create a monopoly, stating that it "would regard any anticompetitive arrangements in the trading of options to be of very serious concern, but [that] after reviewing the proposed transfer closely, the Commission disagrees with these assertions." SEC Release No. 34–38542, 1997 SEC LEXIS 900, at *21 (Apr. 23, 1997).

As noted in the District Court Opinion, the Commission since 1997 has

continue[d] to oversee the options markets and to approve coordinated activity by the exchanges. Pursuant to Rules 12d1–3 and 12d2–2, respectively, the SEC is informed each time an exchange proposes to list or delist an equity options class. The SEC recently authorized the exchanges to act jointly with respect to a number of issues, such as (1) planning strategies for options quote message traffic, (2) developing an intermarket linkage plan for multiply traded options and (3) phasing-in the implementation of decimal pricing.

District Court Opinion, 2001 WL 128325, at *6 (citing SEC Release No. 34–41843, 1999 SEC LEXIS 1807, at *1 (Sept. 8,

1999); SEC Release No. 34–42029, 1999 SEC LEXIS 2215, at *1 (Oct. 19, 1999); SEC Release No. 34–42360, [2000] SEC LEXIS 114, at *1 (Jan. 28, 2000). Indeed, the SEC, as well as the United States Department of Justice ("DOJ"), investigated assertions of antitrust violations such as those alleged in the present class actions. In September 2000, the SEC found that certain exchanges had improperly followed a course of conduct that limited multiple listing. *See, e.g.,* SEC Release No. 43268, 2000 SEC LEXIS 1881, at *8 (Sept. 11, 2000) ("Member firms of certain of the respondent exchanges made proposals to multiply list options. In order to avoid or defer multiple listing, the respondent exchanges rebuffed or denied these proposals without an adequate basis in their rules and, in some instances, threatened or harassed member firms who made the proposals."). The exchanges in question were censured, and they agreed, *inter alia,* to change certain procedures that had facilitated exclusivity of listing. *Id.* at *15.

In connection with defendants' motions to dismiss the consolidated complaint on the ground that the SEC's authorized regulation of the listing and trading of options constituted an implied repeal of the Sherman Act with respect to such matters, the DOJ submitted to the district court a brief on behalf of the United States as *amicus curiae,* arguing that implied repeal is not warranted. The DOJ's brief stated that

> [t]he court can, and should, hold that the alleged conduct, which as alleged contravenes both SEC rule and the Sherman Act, is, like other conspiracies in restraint of trade, subject to the federal antitrust laws. To avoid any possible future conflict with SEC regulatory policy, the court should consider including in any injunction language permitting otherwise enjoined conduct should the SEC, acting pursuant to statutory au-

thorization, permit such conduct in the future.

> . . . .

> The court should hold that there is no implied repeal of the antitrust laws with respect to alleged conduct prohibited by SEC rule.

(DOJ *amicus curiae* brief to the district court, dated June 1, 2000, at 12–13.)

The district court invited the SEC as well to submit its views as *amicus curiae.* The Commission complied, in a brief in which it concurred in the view of the DOJ "that the federal antitrust laws are not impliedly repealed with respect to the conduct alleged in these cases, if it occurred." (SEC *amicus curiae* brief to the district court, dated June 16, 2000, at 2.) The Commission stated that

> [t]his is an unusual case, in which the Commission has addressed the precise conduct at issue and has decided to prohibit it in order to provide competition among the exchanges. It does not present a situation where, in our view, the antitrust laws are impliedly repealed, such as where the securities laws authorize the conduct or the Commission has approved or permitted it, either expressly or implicitly—for example, by failing to act with respect to conduct subject to the Commission's pervasive regulation.

(*Id.* at 2–3.)

Thereafter, the district court notified the parties that it would convert defendants' Rule 12(b)(6) motions, to the extent that they were based on the theory of implied repeal, to motions for summary judgment. The court invited the parties to file additional papers and indicated that it would decide the implied repeal issue first, which might dispose of the entire antitrust dispute. Oral argument of the motions was heard in November 2000.

B. *The Proposed Settlements*

In the meantime, plaintiffs had reached settlement agreements with certain of the defendants. In May 2000, plaintiffs entered into agreements with the Pacific Exchange and the Philadelphia Exchange. In September 2000, plaintiffs entered into agreements with AMEX, CBOE, and 18 of the market maker defendants. The agreements, with certain caveats, called for the settling defendants to pay the plaintiff class a total of more than $84 million.

As court approval is required for the settlement of a class action, *see* Fed. R.Civ.P. 23(e), plaintiffs and those defendants promptly moved in the district court for approval of the respective settlement agreements. In October 2000, the court delayed consideration of the approval motions, stating that it would first determine whether the Sherman Act, to the extent it was invoked in these actions, had been impliedly repealed by the Exchange Act. The court indicated that it would consider the requests for preliminary approval of the settlement agreements after it decided the summary judgment motions.

C. *The District Court's Decisions*

In its February 14, 2001 opinion, the district court granted defendants' summary judgment motions on the ground of implied repeal. The court described the above course of SEC regulation and noted that although the Commission's view had varied considerably as to whether or not multiple listing and trading of equity options should be allowed or prohibited, Commission regulation had been pervasive. The court concluded that, based on the principles set out in *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), the Exchange Act impliedly repealed the Sherman Act with respect to the listing and trading of equity options on securities ex-

changes regulated by the SEC. *See* District Court Opinion, 2001 WL 128325, at *7.

Following issuance of the February 14 Opinion and prior to the entry of a judgment, plaintiffs and some of the settling defendants asked the district court to set a date for argument of the pending Rule 23(e) motions for preliminary judicial approval of the settlement agreements. Motions for such approval had first been filed in mid–2000. Without setting a date to hear those motions, the court entered a final judgment dismissing the consolidated complaint on March 2, 2001 ("March 2001 Judgment" or "Judgment").

By order dated March 6, 2001, the court scheduled argument on the motions for approval of the proposed settlements. In connection with those motions, plaintiffs sought clarification of the March 2001 Judgment. Although the Judgment itself indicated merely that summary judgment was granted, the district court in its February 14 Opinion had stated:

*This Court has no jurisdiction* to determine whether [plaintiffs'] allegations have any substantive merit. Because the listing and trading of options classes falls within the purview of the regulatory scheme devised by Congress to govern the securities industry, and the active exercise of that authority by the Securities and Exchange Commission ... conflicts with the operation of the antitrust laws, the Court cannot proceed to adjudicate this matter.

District Court Opinion, 2001 WL 128325, at *1 (emphasis added). Accordingly, on March 16, 2001, plaintiffs moved pursuant to Fed.R.Civ.P. 59(e) for an amendment of the Judgment, to

clarify[ ] whether the March [2001] Judgment was intended by the Court to be a dismissal for lack of subject matter

jurisdiction pursuant to Fed.R.Civ.P. 12(h)(3), or a dismissal on the merits based upon the affirmative defense of the implied repeal doctrine pursuant to Fed.R.Civ.P. 56(b). If it is the latter, plaintiffs respectfully request that the Court also amend the March [2001] Judgment to provide that it shall only apply to those defendants who had not entered into an agreement to settle all claims asserted against them prior to the entry of the judgment on March 2, 2001 ... unless the Court subsequently enters an Order denying final approval of the proposed settlements pursuant to Fed.R.Civ.P. 23(e) which becomes final after the exhaustion of any appeals, in which event, the March [2001] Judgment would then apply to all of the defendants.

(Plaintiffs' Motion To Alter or Amend Judgment Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, at 1.)

In an Opinion and Order dated April 24, 2001, reported at 171 F.Supp.2d 174 (2001) ("April Order"), the district court denied the motion to alter or amend the March 2001 Judgment and refused to approve the settlement agreements on the ground that, "by entering summary judgment in favor of the defendants on the implied repeal issue, this Court divested itself of subject matter jurisdiction over plaintiffs' antitrust claims." 171 F.Supp.2d at 177. The court concluded that it thus lacked jurisdiction to entertain the motions for approval of the class action settlements:

Plaintiffs are correct that federal subject matter jurisdiction was appropriate at the outset of the litigation because *at that time* a dispute existed as to whether the antitrust laws applied to plaintiffs' claims. However, through its Summary Judgment Order, the Court resolved this issue by holding that the antitrust laws were impliedly repealed with respect to

the defendants' conduct and dismissed the case. At that point, there was no longer any cause of action over which the Court could exercise jurisdiction.

April Order, 171 F.Supp.2d at 178 (emphasis in original).

These appeals followed.

## II. DISCUSSION

On appeal, plaintiffs contend principally that the district court's application of the doctrine of implied repeal to the allegations of this case was erroneous because there is no conflict between the Exchange Act and the Sherman Act since agreements to restrict the listing and trading of equity options to one exchange at a time are prohibited by both the Sherman Act and SEC Rule 19c–5. As to their motions for preliminary court approval of the proposed settlement agreements, plaintiffs contend, *inter alia,* that the district court erred in concluding that the Exchange Act's implied repeal of the Sherman Act deprived the court of jurisdiction to entertain the approval motions. For the reasons that follow, we conclude that the district court's ruling of implied repeal was correct; but we disagree with its conclusion that that ruling deprived it of subject matter jurisdiction over the case.

### A. *Implied Repeal of the Antitrust Laws*

"It is a cardinal principle of construction that repeals by implication are not favored." *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939). The basic framework for analysis of whether federal securities laws impliedly repeal § 1 of the Sherman Act with respect to particular conduct, *i.e.,* whether a defendant is entitled to immunity from liability under the antitrust laws for that conduct, has been set out by the Supreme Court in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct.

1246, 10 L.Ed.2d 389 (1963), *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) ("*Gordon*"), and *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) ("*NASD*").

In *Silver*, the Court established the baseline principle that repeal of the antitrust laws by the Exchange Act is to be "implied only if necessary to make th[at] Act work, and even then only to the minimum extent necessary." 373 U.S. at 357, 83 S.Ct. 1246. *Silver* involved an antitrust challenge to an order, issued by NYSE pursuant to its Constitution and existing rules, requiring its members to remove any private direct telephone connections they had with offices of nonmember firms. The Court concluded that the Exchange Act did not impliedly repeal the antitrust laws with respect to that NYSE order because, although the Exchange Act gave the SEC

> the power to request exchanges to make changes in their rules, § 19(b), 15 U.S.C. § 78s(b), and impliedly, therefore, to disapprove any rules adopted by an exchange, see also § 6(a)(4), 15 U.S.C. § 78f(a)(4), it d[id] not give the Commission jurisdiction to review particular instances of enforcement of exchange rules.

*Silver*, 373 U.S. at 357, 83 S.Ct. 1246. Because the SEC lacked the authority to regulate the conduct challenged in the complaint, the Court concluded that there was no potential for the antitrust laws to overlap or conflict with the regulatory power of the SEC. *See id.* at 358, 83 S.Ct. 1246. Further, given the absence of SEC authority, there was a need for applicability of the antitrust laws, for if those laws were deemed inapplicable the challenged conduct would be unreviewable. *See id.* at 358–59, 83 S.Ct. 1246. The Court stated that

> *[a]pplicability of the antitrust laws ... rests on the need for vindication of their positive aim of insuring competitive freedom.* Denial of their applicability would defeat the congressional policy reflected in the antitrust laws without serving the policy of the Securities Exchange Act. *Should review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to antitrust exemption would be presented.*

*Id.* at 360, 83 S.Ct. 1246 (emphases added).

Such a " 'different case' " was presented in *Gordon, see* 422 U.S. at 685, 95 S.Ct. 2598. The conduct challenged there was the practice of securities exchanges and their members of using fixed rates of commission; and unlike the conduct at issue in *Silver*, the fixing of commission rates was subject to ample SEC regulatory authority. The Supreme Court in *Gordon* reiterated the principle enunciated in *Silver* that repeal of the antitrust laws by the Exchange Act is to be "implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary," 422 U.S. at 683, 95 S.Ct. 2598 (internal quotation marks omitted), and proceeded to explore the history of the rate agreements, the statutory authority conferred on the SEC to regulate commission-rate practices, and the agency's exercise of that authority. The Court noted that

> the commission rate practices of the exchanges have been subjected to the scrutiny and approval of the SEC. If antitrust courts were to impose different standards or requirements, the exchanges might find themselves unable to proceed without violation of the mandate of the courts or of the SEC. *Such different standards are likely to result be-*

*cause the sole aim of antitrust legislation is to protect competition, whereas the SEC must consider, in addition, the economic health of the investors, the exchanges, and the securities industry.* Given the expertise of the SEC, the confidence the Congress has placed in the agency, and the active roles the SEC and the Congress have taken, permitting courts throughout the country to conduct their own antitrust proceedings would conflict with the regulatory scheme authorized by Congress rather than supplement that scheme.

.... Although *SEC action in the early years appears to have been minimal, it is clear that since 1959 the SEC has been engaged in deep and serious study of the commission rate practices of the exchanges and of their members, and has required major changes in those practices.* The ultimate result of this long-term study has been a regulatory decree requiring abolition of the practice of fixed rates of commission as of May 1, 1975, and the institution of full and complete competition.

*Gordon,* 422 U.S. at 689–90, 95 S.Ct. 2598 (footnotes omitted) (emphases added).

The *Gordon* Court also noted that although Congress had subsequently enacted a statutory section adopting the SEC regulatory provision banning fixed rates, Congress also explicitly provided that the SEC, under certain circumstances and upon the making of specified findings, was empowered to allow the resumption of fixed rates. *See id.* at 691, 95 S.Ct. 2598. The Court concluded that with respect to commission-rates agreements, the Exchange Act impliedly repealed the Sherman Act:

In sum, the statutory provision authorizing regulation, § 19(b)(9), the long regulatory practice, and the continued congressional approval illustrated by the new legislation, point to one, and only one, conclusion. The Securities Exchange Act was intended by the Congress to leave the supervision of the fixing of reasonable rates of commission to the SEC. Interposition of the antitrust laws, which would bar fixed commission rates as *per se* violations of the Sherman Act, in the face of positive SEC action, would preclude and prevent the operation of the Exchange Act as intended by Congress and as effectuated through SEC regulatory activity. Implied repeal of the antitrust laws is, in fact, necessary to make the Exchange Act work as it was intended; failure to imply repeal would render nugatory the legislative provision for regulatory agency supervision of exchange commission rates.

*Gordon,* 422 U.S. at 691, 95 S.Ct. 2598.

In NASD, the Court was confronted with a Sherman Act suit by the government alleging, *inter alia,* that the National Association of Securities Dealers, along with certain mutual funds, fund underwriters, and broker-dealers, had agreed to restrict the sale, and to fix the resale prices, of mutual fund shares in the secondary market. *See* 422 U.S. at 700, 95 S.Ct. 2427. The *NASD* Court, while rejecting the defendants' contention that their conduct was authorized by the language of § 22(f) of the Investment Company Act of 1940 ("1940 Act"), 15 U.S.C. § 80a–22(f), concluded that the "pervasive regulatory scheme," 422 U.S. at 735, 95 S.Ct. 2427, established by the 1940 Act and the 1938 Maloney Act amendments to the Exchange Act, *see* 15 U.S.C. § 78o–3, gave the SEC authority to regulate such conduct and that the implied repeal of the Sherman Act with respect to that conduct was necessary in order to preserve the Commission's flexibility to perform its authorized function:

There can be little question that the broad regulatory authority conferred upon the SEC by the Maloney and Investment Company Acts enables it to monitor the activities questioned in Count I, and the history of Commission regulations suggests no laxity in the exercise of this authority. To the extent that any of appellees' ancillary activities frustrate the SEC's regulatory objectives it has ample authority to eliminate them.

Here implied repeal of the antitrust laws is "necessary to make the [regulatory scheme] work." *Silver v. New York Stock Exchange,* 373 U.S., at 357, 83 S.Ct. 1246. In generally similar situations, we have implied immunity in particular and discrete instances to assure that the federal agency entrusted with regulation in the public interest could carry out that responsibility free from the disruption of conflicting judgments that might be voiced by courts exercising jurisdiction under the antitrust laws.... *In this instance, maintenance of an antitrust action for activities so directly related to the SEC's responsibilities poses a substantial danger that appellees would be subjected to duplicative and inconsistent standards.* This is hardly a result that Congress would have mandated. We therefore hold that with respect to the activities challenged in Count I of the complaint, the Sherman Act has been displaced by the pervasive regulatory scheme established by the Maloney and Investment Company Acts.

*NASD,* 422 U.S. at 734–35, 95 S.Ct. 2427 (footnotes omitted) (emphasis added); *see also id.* at 722, 95 S.Ct. 2427 (finding "no way to reconcile the Commission's power to authorize these restrictions with the competing mandate of the antitrust laws").

In light of the Supreme Court's decisions in *Silver, Gordon,* and *NASD,* this Court has summarized the implied repeal doctrine as operating in "two narrowly-defined situations," to wit, "first, when an agency, acting pursuant to a specific Congressional directive, actively regulates the particular conduct challenged, ... and second, when the regulatory scheme is so pervasive that Congress must be assumed to have forsworn the paradigm of competition." *Northeastern Telephone Co. v. AT & T,* 651 F.2d 76, 82 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *see id.* at 83–84 (finding no implied repeal of the antitrust laws where the Federal Communications Act of 1934, 47 U.S.C. §§ 151–609, did not expressly authorize the Federal Communications Commission to approve protective coupler designs that unreasonably restricted competition, and application of the Sherman Act would not frustrate that agency's ability to regulate the telecommunication industry); *see also Finnegan v. Campeau Corp.,* 915 F.2d 824, 828 (2d Cir.1990) (holding that, with respect to disclosures of price information in the context of a tender offer, the Sherman Act was impliedly repealed by the Williams Act, 15 U.S.C. §§ 78m(d)-(e) and 78n(d)-(f)).

These principles have most recently been applied by this Court in *Friedman v. Salomon/Smith Barney, Inc.,* 313 F.3d 796 (2d Cir.2002), in which we considered allegations that underwriters and brokerage firms participated in a price-fixing scheme, designed to stabilize the market price of securities sold in initial public offerings, by prohibiting the immediate resale of such securities. We noted that

> implied immunity exists where allowing an antitrust lawsuit to proceed would conflict with Congress's implicit determination that the SEC should regulate the alleged anti-competitive conduct....

The source of the conflict may, but need not, involve affirmative SEC action. Conflict also can exist where the SEC has jurisdiction over the challenged activity and deliberately has chosen not to regulate it.

313 F.3d 796, 801. We reviewed the history of the regulation of price stabilization practices in both the distribution and aftermarket phases of public offerings. *See id.* at 801. We noted that the Exchange Act gave the SEC authority to regulate such conduct, that the SEC had repeatedly acknowledged its awareness of such conduct, and that it had exercised its regulatory authority over such conduct even though it had never elected to prohibit it, and that the Exchange Act "allows price stabilization practices that the SEC does not prohibit," *id.* at 802. We concluded that, given the conflict between the statutory scheme and the antitrust laws, "implied immunity bars plaintiffs' [antitrust] challenge to price stabilization practices in the aftermarket." *Id.*

■ To be sure, antitrust immunity is not to be presumed from the mere existence of overlapping authority; rather the analysis must focus on the "potential" for "*conflicts* between the antitrust laws and a[n authorized] regulatory scheme," *Strobl v. New York Mercantile Exchange,* 768 F.2d 22, 27 (2d Cir.) (*"Strobl"*) (emphasis in original), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985). This Court and the Supreme Court have used the term "plain repugnancy" to describe the tension between statutes that justifies implied repeal. *See Gordon,* 422 U.S. at 682, 95 S.Ct. 2598; *Strobl,* 768 F.2d at 27. In *Strobl,* we noted that the "antitrust laws may not apply when such laws would prohibit an action that a regulatory scheme might allow," *id.;* but we saw no potential for regulatory permission of the conduct at issue there, to wit, manipulation of commodity prices, because the Commodities Exchange Act itself specifically forbade price manipulation, *see id.* at 27–28.

In the present case, we agree with the district court's conclusion that the Exchange Act impliedly repeals § 1 of the Sherman Act with respect to the listing and trading of equity options, because the implied repeal is necessary to preserve the authority of the SEC to regulate that conduct. The history of the Commission's extensive study and regulation of such matters is set out in Part I.A. above and in the district court's February 14 Opinion, 2001 WL 128325, at *1–*6. The Exchange Act itself does not prohibit agreements for exclusivity in options listing, and, as described, the Commission has taken varied positions with respect to the appropriateness of multiplicity, in part because under the Exchange Act it is concerned with more than just the protection of competition, which is "the sole aim of antitrust legislation," *Gordon,* 422 U.S. at 689, 95 S.Ct. 2598. "[T]he SEC must consider, in addition, the economic health of the investors, the exchanges, and the securities industry." *Id.* Thus, in evaluating the wisdom under the Exchange Act of requiring or prohibiting multiple listings, the Commission has perforce balanced the interest of promoting competition, on the one hand, against undesirable potential effects, on the other hand, such as market fragmentation, *see* SEC Mar. 26, 1980 Release, 1980 SEC LEXIS 1784, at *28, financial injury to regional exchanges, *see id.* at *30 n. 47, and "deleterious structural changes in the markets," SEC Release No. 17577, 1981 SEC LEXIS 1976, at *17 (Feb. 26, 1981), in order to carry out its statutory duty to enhance "the 'economically efficient execution of securities transactions,'" SEC Release No. 34–24613, 1987 SEC LEXIS 4394, at *29–*30 (June 18, 1987) (quoting 15 U.S.C. § 78k–1(a)(1)(C)(i)).

■ Although plaintiffs contend that an implied repeal is not needed to avoid conflicts here because exclusivity agreements are now prohibited by both the antitrust laws and the SEC, that contention misperceives the proper analytical focus. The appropriateness of an implied repeal does not turn on whether the antitrust laws conflict with the current view of the regulatory agency; rather it turns on whether the antitrust laws conflict with an overall regulatory scheme that empowers the agency to allow conduct that the antitrust laws would prohibit. *Accord Friedman v. Salomon/Smith Barney, Inc.,* 313 F.3d 796, 2002 WL 31844676, at *4. In *Gordon,* for example, the SEC had "requir[ed] abolition of the practice of fixed rates of commission as of May 1, 1975, and [required] the institution of full and complete competition." *Gordon,* 422 U.S. at 690, 95 S.Ct. 2598. Thus, when the case reached the Supreme Court, the fixing of commission rates was prohibited by both the antitrust laws and the SEC. Yet, the Court did not suggest that an implied repeal had become inappropriate because of that convergence. Rather, noting the potential for a change in the Commission's view, *see id.* at 691, 95 S.Ct. 2598, the Court stated that "permitting courts throughout the country to conduct their own antitrust proceedings would conflict with *the regulatory scheme* authorized by Congress," *id.* at 690, 95 S.Ct. 2598 (emphasis added), and that the "[i]mplied repeal of the antitrust laws *is,* in fact, necessary to" avoid "render[ing] nugatory *the legislative provision for regulatory agency supervision,*" *id.* at 691, 95 S.Ct. 2598 (emphases added). Thus, the proper focus is not on the Commission's current regulatory position but rather on the Commission's authority to permit conduct that the antitrust laws would prohibit. *See, e.g., NASD,* 422 U.S. at 721–22, 95 S.Ct. 2427 ("necessarily" concluding that the challenged agreements were "immune

from liability under the Sherman Act" where the Court could "see no way to reconcile" that Act with "*the Commission's power* to authorize these restrictions" (emphasis added)).

■ Plaintiffs also contend, relying on *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), that the district court was required to defer to the SEC and DOJ views, submitted to it as *amici curiae,* that there is no need for an implied repeal here. We disagree, *Chevron* dealt with the deference that is due when an agency interprets a statute that it is responsible for enforcing. *See* 467 U.S. at 844, 104 S.Ct. 2778 ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency" to which interpretive authority has been delegated). Although some deference may be accorded to an agency's view on a matter within its particular expertise, the decision as to whether, in a given set of circumstances, one statutory scheme supersedes the other is, "in the end," to be made by the courts. *Gordon,* 422 U.S. at 686, 95 S.Ct. 2598 ("[T]he determination of whether implied repeal of the antitrust laws is necessary to make the Exchange Act provisions work is a matter for the courts."); *see also Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 306–08, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973).

In the present case, the district court plainly took into account the proffered views of the SEC as to questions within that agency's expertise, to wit, its authority under the Exchange Act to regulate the listing and trading of equity options and the permissibility of the challenged practices under that statute. The court was not required to accept the views expressed to it by the SEC and the DOJ that the implied repeal of the antitrust laws by the

Exchange Act with respect to these practices was not needed. We also note, although it is not necessary to our decision, that, in the wake of the district court's ruling of implied repeal, the SEC, unlike the DOJ, has not urged reversal.

In sum, the SEC has ample statutory authority, which it has repeatedly exercised, to regulate the listing and trading of equity options. It has at times encouraged multiple listing and at times disapproved of that practice. The DOJ has taken the position that the challenged conduct "as alleged contravenes ... the Sherman Act." (DOJ *amicus curiae* brief to the district court, dated June 1, 2000, at 12.) Although the SEC's present stance is that agreements for exclusive listing are forbidden, the Commission has the power to alter that position if it concludes that other concerns within its domain outweigh the need to protect competition. We see no way to reconcile that SEC authority, which may be exercised to permit agreements for exclusive listing of equity options, with the antitrust laws. Accordingly, we affirm the district court's ruling that, with respect to the challenged conduct, the Exchange Act impliedly immunizes defendants against liability under § 1 of the Sherman Act.

## B. *Jurisdiction To Entertain the Preliminary Settlement Motions*

■ We disagree, however, with the district court's view that its holding of implied repeal deprived it of jurisdiction to consider the parties' pending motions for judicial approval of their proposed settlements of this consolidated class action. Although the doctrine of implied repeal is sometimes described in terms of the district court's "antitrust jurisdiction," *e.g.*, *Strobl*, 768 F.2d at 27, we think it is more properly viewed as conferring an immunity that is an affirmative defense that does not affect the court's subject matter jurisdiction over the action.

■ As a general matter, where a complaint "is so drawn as to seek recovery directly under the Constitution or laws of the United States," *Bell v. Hood*, 327 U.S. 678, 681, 66 S.Ct. 773, 90 L.Ed. 939 (1946), the district court has subject matter jurisdiction unless the federal claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous," *id.* at 682–83, 66 S.Ct. 773. Thus, the district court has jurisdiction where "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another." *Id.* at 685, 66 S.Ct. 773. The "inadequacy" of a federal claim is ground for "[d]ismissal for lack of subject-matter jurisdiction ... only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.' " *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974)). Once a federal court has determined that a plaintiff's jurisdiction-conferring claims are not insubstantial on their face, "no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter." *Baker v. Carr*, 369 U.S. 186, 199, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Thus, the district court's subject matter jurisdiction to entertain a suit based on a federal claim that is not wholly insubstantial, frivolous, or foreclosed by prior decisions of the Supreme Court, is not defeated by the defendant's

assertion of a position that is properly characterized as an affirmative defense.

■■■ Most immunities are affirmative defenses. *See, e.g., Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (qualified immunity for a public official); *Murphy v. Waterfront Commission of New York Harbor,* 378 U.S. 52, 104, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) (White, J., concurring) (absolute immunity); *Troxler v. Owens–Illinois, Inc.,* 717 F.2d 530, 532–33 (11th Cir.1983) (statutory immunity); 2 *Moore's Federal Practice* § 8.07[5] (3d ed. 1999) ("In addition to the 19 affirmative defenses set forth[ in Fed. R.Civ.P.] 8(c)[, that Rule] requires 'any other matter constituting an avoidance or an affirmative defense' to be pleaded. Affirmative defenses and avoidances other than those specifically referenced [in Rule 8(c) ] have been found to include common law immunity, statutory immunity, [and] exemption under a statute or regulation ....") (footnotes omitted). Affirmative defenses can be waived, *see, e.g., McCardle v. Haddad,* 131 F.3d 43, 51 (2d Cir.1997); *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984); lack of subject matter jurisdiction cannot be waived, *see, e.g., Bender v. Williamsport Area School District,* 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986); *Louisville & Nashville R.R. Co. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908); Fed.R.Civ.P. 12(h)(3).

In discussing whether a given federal securities statute impliedly repeals an antitrust law, the Supreme Court has not suggested that the implied repeal deprives the district court of subject matter jurisdiction. It has instead referred to the implied repeal as giving the defendant "immunity" from liability under the antitrust laws. Thus, in *Silver,* the Court never referred to federal courts' "antitrust jurisdiction" or used the phrase "subject mat-

ter jurisdiction." The *Silver* Court used the term "jurisdiction" only in connection with the power of the SEC to regulate the challenged conduct. *See, e.g.,* 373 U.S. at 357, 83 S.Ct. 1246 ("Commission jurisdiction"); *id.* at 358, 83 S.Ct..1246 ("Commission's lack of jurisdiction"). *Silver* was described in *Gordon* as dealing with conduct that would be a *per se* violation of the Sherman Act "absent any *immunity* derived from the regulatory laws." *Gordon,* 422 U.S. at 683, 95 S.Ct. 2598 (emphasis added).

In the earlier stages of the *Gordon* litigation, the opinions of the lower courts, whose rulings of implied repeal were eventually upheld, had spoken not only in terms of antitrust immunity or exemption from the antitrust laws, but also in terms of a "denial of antitrust jurisdiction," *Gordon v. New York Stock Exchange, Inc.,* 498 F.2d 1303, 1305 (2d Cir.1974), or the "withdrawal of antitrust jurisdiction," *id.* at 1309 n. 8, or the "court['s] lack[ of] jurisdiction to entertain an anti-trust attack on the commission structure of the Exchanges," *Gordon v. New York Stock Exchange, Inc.,* 366 F.Supp. 1261, 1264 (S.D.N.Y.1973). However, no issue in that litigation hinged on whether the implied repeal impacted the court's subject matter jurisdiction, and the Supreme Court in *Gordon* described the lower-court rulings as "utiliz[ing] the framework for analysis of antitrust immunity in the regulated securities area that was established a decade ago in *Silver,*" 422 U.S. at 662, 95 S.Ct. 2598 (describing the district court opinion), and "devot[ing] its opinion to the problem of antitrust immunity," *id.* (describing the court of appeals opinion).

The Supreme Court itself in *Gordon,* except for an analogy drawn to the jurisdiction of the Interstate Commerce Commission, referred to jurisdiction only in connection with the regulatory power of

the SEC. Never using the phrases antitrust jurisdiction or subject matter jurisdiction, the Supreme Court in *Gordon* at the outset described its task as "[r]esolution of the issue of antitrust immunity for fixed commission rates," *id.* at 663, 95 S.Ct. 2598, and it thereafter repeatedly referred to the question as whether there was "antitrust immunity" or simply "immunity," *see, e.g., id.* at 686, 95 S.Ct. 2598 ("the immunity issue"); *id.* at 688, 95 S.Ct. 2598 ("[W]e are concerned with whether antitrust immunity, as a matter of law, must be implied in order to permit the Exchange Act to function as envisioned by the Congress. The issue of the wisdom of fixed rates becomes relevant only when it is determined that there is no antitrust immunity."); *id.* at 689, 95 S.Ct. 2598 ("We agree with the District Court and the Court of Appeals, and with respondents, that to deny antitrust immunity with respect to commission rates would be to subject the exchanges and their members to conflicting standards.").

Similarly, in *NASD*, the Supreme Court generally spoke of the implied repeal doctrine in terms of antitrust immunity rather than a lack of federal-court jurisdiction. *See, e.g.,* 422 U.S. at 705, 95 S.Ct. 2427 ("The questions presented require us to determine whether § 22(d) obligates appellees to engage in the practices challenged in Counts II–VIII and thus necessarily confers antitrust immunity on them."); *id.* at 719, 95 S.Ct. 2427 ("[i]mplied antitrust immunity is not favored"); *id.* at 726, 95 S.Ct. 2427 (discussing government's "contention that the SEC's exercise of regulatory authority has been insufficient to give rise to an implied immunity for agreements conforming with § 22(f)"); *id.* at 730, 95 S.Ct. 2427 ("the question presented is whether the SEC's exercise of regulatory authority ... is sufficiently pervasive to confer an implied immunity"). Although an implied antitrust

immunity prevents a court from "*exercising* jurisdiction under the antitrust laws," *id.* at 734, 95 S.Ct. 2427 (emphasis added), in none of these cases did the Supreme Court suggest that that immunity was anything more than an affirmative defense.

There is, of course, one type of immunity not discussed above—a government's sovereign immunity—that has frequently been referred to as imposing constraints that are jurisdictional. *See, e.g., United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) ("the terms of [the] consent [of the United States, as sovereign] to be sued in any court define that court's jurisdiction to entertain the suit"); *but see Wisconsin Department of Corrections v. Schacht,* 524 U.S. 381, 389, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (a state's immunity under the "Eleventh Amendment ... does not automatically destroy original jurisdiction"); *Calderon v. Ashmus,* 523 U.S. 740, 745 n. 2, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998) ("[w]hile the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power ... we have recognized that it is not coextensive with the limitations on judicial power in Article III"). Whether or not sovereign immunity poses a jurisdictional obstacle is of no moment here, for there can be no suggestion that the immunity conferred on a private entity on the basis that it is subject to one set of laws that takes precedence over another law is on a par with the immunity enjoyed by a government. The immunity conferred by an implied repeal of the antitrust laws simply prevents the court from imposing liability under those laws.

In the present case, plaintiffs' claims under the Sherman Act were neither frivolous nor contrived merely to create federal jurisdiction. Nor were their claims foreclosed by prior decisions of the Supreme Court, since a determination of whether

there is an implied repeal requires a thorough analysis of the precise practice that has been challenged and the regulatory scheme with respect to that practice. *See generally Gordon,* 422 U.S. at 663, 95 S.Ct. 2598. Thus, the district court, as it indicated in its April Order, had jurisdiction at the outset to decide whether defendants were entitled to immunity from liability under the antitrust laws. Since the parties sought approval of their settlement agreements before the court had adjudicated the immunity defense, and since such a defense may be waived, the court had jurisdiction to entertain and rule on the motions for approval of the proposed settlements. Having entered a final judgment without dealing with those pending motions, the court should have entertained them in conjunction with the subsequent motion to alter or amend the final judgment, and it should have granted the latter motion if it approved the proposed settlements.

■ Finally, we note that defendant LETCO, which was a party to the September settlement agreement, has argued that plaintiffs' appeal from the district court's April Order is moot as to the parties to that agreement because the agreement was, by its terms, automatically rescinded as a result of the district court's denial of the approval motions. We reject LETCO's mootness contention because the rescission terms of the settlement agreement have no bearing on the question presented for review, namely, the correctness of the April Order's ruling that the district court lacked subject matter jurisdiction to entertain the approval motions after finding implied repeal of the antitrust laws.

We express no view as to the correctness of LETCO's contention that the September settlement agreement became void because of the occurrence of an event specified in that agreement. That question may be considered by the district court on remand.

## CONCLUSION

We have considered all of the parties' contentions on this appeal and, except to the extent indicated above, have found them to be without merit. The dismissal of the claims asserted in the consolidated complaint is affirmed; the April Order refusing to entertain the motions for approval of the class action settlement agreements is vacated, and the matter is remanded for further proceedings not inconsistent with this opinion.